UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DWAINE TAYLOR,

                 Plaintiff,

      -against-

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF CORRECTION ("DOC")
SUPERVISING WARDEN ARTHUR OLIVARI;
CHIEF OF DEPARTMENT LARRY W. DAVIS,
SR.; CHIEF OF DEPARTMENT MICHAEL
HOURIHANE;WARDEN WILLIAM
CLEMMONS; DEPUTY WARDEN TURHAM
GUMUSDERE; ASSISTANT DEPUTY
WARDEN EXECUTIVE OFFICER AT BXDC
JACQUELINE BRANTLEY; and CORRECTION
OFFICER JOHN DOES #1-#7,

               Defendants.

No. 12 Civ. 5881 (RPP)


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE


Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

The Legal Aid Society Prisoners' Rights Project
199 Water Street, 6th Floor
New York, New York 10038
(212) 577-3530

**TABLE OF CONTENTS**

PAGE NO.

TABLE OF AUTHORITIES ...............................................................................................ii-iii

PRELIMINARY STATEMENT ...............................................................................................1

FACTS ...............................................................................................3

    *The May 24, 2011 Attack on Plaintiff* ...............................................................................3

    *The Redacted Video Recording* ...............................................................................5

    *Destruction of Three Hours of the Video Recording* ...............................................................6

ARGUMENT ...............................................................................................7

    I.    DEFENDANTS HAD A DUTY TO PRESERVE THE UNEDITED, CONTINUOUS VIDEO RECORDING AS OF MAY 24, 2011, THE DATE OF THE INCIDENT ...............................................................7

        A.    Defendants' Duty to Preserve Arose on May 24, 2011 ...............................8

        B.    Defendants Had A Duty to Preserve A Continuous, Unedited Video ...............................................................10

    II.    DEFENDANTS WERE CULPABLE IN FAILING TO PRESERVE THE UNEDTIED, CONTINUOUS VIDEO RECORDING ...............................11

    III.    THE DESTROYED FOOTAGE WAS RELEVANT ...............................13

    IV.    AN ADVERSE INFERENCE, PRECLUSION, AND FEES ARE APPROPRIATE SANCTIONS ...............................................................15

        A.    The Court Should Grant an Adverse Inference ...............................16

        B.    The Court Should Preclude Evidence Relating to the Destroyed Footage and Its Review ...............................................................17

        C.    Attorneys' Fees Should Be Awarded ...............................................19

CONCLUSION ...............................................................................................20

**Cases**

*Aiello v. Kroger Co.*,
   No. 08 Civ. 01729 (HDM), 2010 WL 3522259 (D. Nev. Sept. 1, 2010) ........................ 18

*Arista Records LLC v. Usenet.com, Inc.*,
   608 F. Supp. 2d 409 (S.D.N.Y. 2009) .............................................................................. 19

*Byrnie v. Town of Cromwell, Bd. of Educ.*,
   243 F.3d 93 (2d Cir. 2001) ................................................................................................. 7

*Casale v. Kelly*,
   710 F. Supp. 2d 347 (S.D.N.Y. 2010) .............................................................................. 19

*Chin v. Port Auth. of New York & New Jersey*,
   865 F.3d 135 (2d Cir. 2012) ............................................................................................. 16

*DeMeo v. Kean*,
   754 F. Supp. 2d 435 (N.D.N.Y. 2010) ............................................................................. 17

*Donato v. Fitzgibbons*,
   172 F.R.D. 75 (S.D.N.Y. 1997) ........................................................................................ 17

*Fujitsu Ltd. v. Fed. Exp. Corp.*,
   247 F.3d 423 (2d Cir. 2001) ............................................................................................... 7

*Great N. Ins. Co. v. Power Cooling, Inc.*,
   No. 06 Civ. 874 (ERK) (KAM), 2007 WL 2687666 (E.D.N.Y. Sept. 10, 2007) ....... 15, 17

*In re WRT Energy Sec. Litig.*,
   246 F.R.D. 185 (S.D.N.Y. 2007) ..................................................................................... 17

*John v. City of New York, et al.*,
   No. 11 Civ. 5610 (RPP) ......................................................................................... 3, 9, 17

*Kronisch v. United States*,
   150 F.3d 112 (2d Cir. 1998) ......................................................................................... 15, 16

*M & T Mortg. Corp. v. Miller*,
   No. 02 Civ. 5410 (NG), 2007 WL 2403565 (E.D.N.Y. Aug. 17, 2007) .......................... 17

*Matteo v. Kohl's Dep't Stores, Inc.*,
   No. 09 Civ. 7830 (RJS), 2012 WL 760317 (S.D.N.Y. Mar. 6, 2012) ....................... 7, 8, 9

*Pastorello v. City of New York*,
   No. 95 Civ. 470 (CSH), 2003 WL 1740606 (S.D.N.Y. Apr. 1, 2003) ............................ 19

*Pension Comm. of Univ. Montreal Pension Plan v. Banc of Am. Sec.*,
   685 F. Supp. 2d 456 (S.D.N.Y. 2010) ................................................................................. 16

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
   306 F.3d 99 (2d Cir. 2002) ................................................................................................. 13

*Richard Green (Fine Paintings) v. McClendon*,
   262 F.R.D. 284 (S.D.N.Y. 2009) ................................................................................. 11, 19

*Siggelko v. Kohl's Dept. Stores, Inc.*,
   No. 06 Civ. 2281 (JS), 2009 WL 750173 (E.D.N.Y. Mar. 17, 2009) .................................. 8

*Slovin v. Target Corp.*,
   No. 12 Civ. 863 (HB), 2013 WL 840865 (S.D.N.Y. Mar. 7, 2013) ......................... passim

*Tafari v. City of New York et al.*,
   No. 13 Civ. 1733 (PAE) ..................................................................................................... 12

*Turner v. Hudson Transit Lines, Inc.*,
   142 F.R.D. 68 (S.D.N.Y. 1991) ............................................................................................ 8

*West v. Goodyear Tire & Rubber Co.*,
   167 F.3d 776 (2d Cir. 1999) ................................................................................... 15, 16, 17

*Zubulake v. UBS Warburg LLC*,
   220 F.R.D. 212 (S.D.N.Y. 2003) .................................................................................... 8, 11

*Zubulake v. UBS Warburg LLC*,
   229 F.R.D. 422 (S.D.N.Y. 2004) ......................................................................................... 7

## <u>Statutes</u>

42 U.S.C. § 1983 ...................................................................................................................... 4

## PRELIMINARY STATEMENT

This motion seeks sanctions for Defendants' spoliation of three hours of video footage that captured a substantial portion of the events giving rise to this lawsuit. On May 24, 2011, Plaintiff Dwaine Taylor was attacked and badly injured by gang-affiliated inmates while he was in the custody of the New York City Department of Correction ("DOC") at the Bronx Detention Complex ("BXDC"). DOC officers stood by and did nothing to protect Plaintiff. The attack was so severe that Plaintiff was left unconscious. His jaw was fractured in multiple places. The Bronx District Attorney's Office is prosecuting the primary perpetrator for the assault. Plaintiff filed this federal civil rights action in the attack's aftermath.

The entire May 24, 2011 incident, including the attack and Defendants' indifference to it, spanned approximately three hours from 12:20 to 3:00 p.m., and was captured on the DOC's ceiling-mounted digital surveillance camera system. The majority of that footage was then destroyed by Defendants – after they reviewed it.

Defendants had a duty to preserve the entire May 24, 2011 video recording when they learned of the attack on Mr. Taylor and knew of the contemporaneous recording. Defendant Assistant Deputy Warden Jacqueline Brantley was the only person to view the complete May 24, 2011 video recording. Although Defendant Brantley was aware that such assaults result in litigation, and she and other DOC staff knew of the recording on the day it was made, she and the DOC neglected to preserve the complete video recording. Instead, Defendant Brantley viewed the full three hours of video footage recorded by the surveillance camera, twice. She then redacted the recording, preserving only a *selected eight minutes* of the three-hour long event. What remains today is a small piece of the full video recording that Defendant Brantley watched, of approximately four minutes at the beginning and four minutes at its end. This edited sliver reflects the first beating of Plaintiff at around 12:20 p.m. on May 24, 2011, and then

1

Plaintiff's attempt to strike back in self-defense at approximately 3:00 p.m. that day. The surviving video does *not* show what happened in the intervening three hours, such as the officers' response to the attack, and their continued indifference to Mr. Taylor's injuries while he remained in close proximity in the cell with his attackers over an extended period of time.

Defendant Brantley allowed the full video recording to be deleted without speaking to a single individual involved in the incident or to any supervisors. Today, she is at once the gatekeeper, editor, and destroyer of this important evidence, and a defendant in this litigation. At her recent deposition, Defendant Brantley testified that she does not recall many aspects of what she viewed, and she misremembered other portions. Defendant Brantley also admitted that review of the entire May 24, 2011 recording would help determine whether

- "[her] staff had followed DOC policies in that time-period,"
- "the pen was being adequately supervised,"
- Mr. Taylor "made any contact with any Correction Officer during those three hours,"
- Mr. Taylor "asked for assistance or made any indication that he was in distress," or
- "anybody else was involved with the incident."

Ex. D at 51-53.[1]

These are some of the key disputes in this case. None of the three hours of video recording containing this evidence was preserved. It is not available today. The prejudice to Plaintiff under these circumstances is manifest. By failing to preserve an unedited, continuous version of the video recording, Defendants deprived Plaintiff of relevant evidence for this case. And this destruction of evidence is a direct consequence of the inadequate DOC policies on preservation and retention of video footage.

---

[1] All Exhibits are attached to the Declaration of Katherine Rosenfeld, dated June 7, 2013, filed in connection with Plaintiff's Motion for Sanctions for Spoliation of Evidence.

Defendants were required to preserve the continuous, unedited footage, not simply self-serving excerpts. Defendants' destruction of the video recording is inexcusable. Plaintiff seeks sanctions, in the form of an adverse inference, and preclusion of evidence and testimony, as well as costs and fees associated with this motion.[2]

## FACTS

### *The May 24, 2011 Attack on Plaintiff*

This action concerns two brutal assaults on twenty-five year-old Plaintiff Dwaine Taylor by gang-affiliated inmates while Mr. Taylor was in DOC's custody. Both assaults were sanctioned by Defendants as part of an ongoing practice ("the Program"). Pursuant to the Program, DOC correction officers at adolescent jails, including the Robert N. Davoren Complex ("RNDC") and the Bronx Detention Complex ("BXDC"), enlist inmates or allow them to assault other inmates as a way to control and discipline those held in custody. For years, the DOC has known that RNDC, its principal adolescent jail on Rikers Island, has been host to a pattern of gang domination and intimidation, in which "correction officers, under 'the Program' give 'favored prisoners free reign to beat, rob and extort whomever they please.'" Compl. ¶ 27. The Program has led to a number of lawsuits in this district, *id.* ¶¶ 30-34, criminal indictments and convictions, *id.* ¶¶ 1-2, hearings before the City Council, *id.* ¶ 36, and media coverage, *id.* ¶ 42. *See also id.* ¶ 29.

In May 2011, Plaintiff Dwaine Taylor was detained at RNDC. *Id.* ¶ 43. While there, Mr. Taylor learned that the Bloods gang worked in concert with DOC officers, who allowed the Bloods to assault other inmates and control the facility. *Id.* ¶ 45.

---

[2] Last year, this Court imposed sanctions on defendants for destroying video evidence in another action arising from a Program-related attack on a young man. *See* Ex. F attached to the Declaration of Katherine Rosenfeld, Transcript of Oral Argument, March 28, 2012, *John v. City of New York, et al.*, No. 11 Civ. 5610 (RPP).

Mr. Taylor suffered his first Program-related attack by a Bloods member on May 24, 2011. *Id.* ¶¶ 47, 53. Mr. Taylor had been transported from RNDC to BXDC for a court appearance, where he was placed in a holding cell ("pen B-4") with approximately sixteen or seventeen other inmates. *Id.* ¶ 47. Batise Boyce, a Bloods member, was one of those inmates. *Id.* ¶ 52. Shortly after Mr. Taylor was placed in pen B-4, Boyce viciously punched Mr. Taylor in the jaw, knocking him down. *Id.* ¶ 53. Mr. Taylor remained in the cell with Boyce for over three more hours, Exs. B & C, during which time Boyce and other inmates punched and kicked Mr. Taylor while he was on the floor. Compl. ¶ 54. Mr. Taylor was knocked unconscious. *Id.* ¶ 54. When Mr. Taylor awoke, inmates were loudly congratulating Boyce. *Id.* ¶ 55. Mr. Taylor was spitting blood and in excruciating pain. *Id.* ¶ 56.

After three hours of this abuse, Mr. Taylor was terrified, and could not understand why the correction officers had not intervened. Compl. ¶ 61. Finally, to get the officers' attention, Mr. Taylor tried to grab Boyce as an officer entered pen B-4 at about 3:00 p.m. Boyce hit Mr. Taylor again. *Id.* The officers intervened and used chemical O.C. (Oleoresin Capsicum) spray to break up the struggle. Ex. C. Mr. Taylor was escorted out of the cell. *Id.* By that point, Mr. Taylor's jaw was visibly broken. Compl. ¶ 67. He was taken to Lincoln Hospital, and diagnosed with multiple fractures to his jaw on both sides of his face. *Id.* ¶¶ 69-70. He underwent surgery and was hospitalized for three days. *Id.* ¶ 74. Mr. Taylor later testified before a grand jury about the attack and Boyce was indicted. *Id.* ¶ 78.

On July 28, 2011, Mr. Taylor filed a Notice of Claim against the City of New York based on the May 24, 2011 attack. Plaintiff filed this 42 U.S.C. § 1983 action on July 31, 2012, based on Defendants' failure to protect him from the May 24, 2011 attack and from a

second horrific Program-related assault on November 6, 2011 in which Mr. Taylor's jaw was fractured for a second time.

### *The Redacted Video Recording*

On May 24, 2011, a ceiling-mounted camera outside of pen B-4 recorded the inside of the pen twenty-four hours a day. Ex. D at 21, 24. Just two four-minute portions of the video recording from May 24, 2011 were preserved beyond, at most, 60 days[3] and are available today.[4] The first portion ("Boyce Assault portion"), recorded at about 12:20 p.m., captured Bloods member Boyce's initial assault of Mr. Taylor. Ex. B. There are approximately a dozen other visible inmates in pen B-4. The recording depicts Boyce run towards Mr. Taylor, and punch Mr. Taylor on the right side of his face. Other inmates drag Mr. Taylor to the back corner of pen B-4, outside of the camera's view. Boyce sits back down on the bench. A few moments later, Mr. Taylor returns to view. He stands with his back to the camera against pen B-4's door, facing Boyce on the bench. Boyce immediately stands up and faces Mr. Taylor. Boyce and Mr. Taylor are interacting. The Boyce Assault portion cuts off.

The next three hours of video were destroyed and no longer exist. When the recording resumes at approximately 3:00 p.m. ("Use of Force portion"), Mr. Taylor is standing in front of pen B-4's door, facing the camera. Ex. C. Unlike the initial recording where there were approximately 15 inmates in the cell, there now appear to be only two other inmates in pen B-4. Mr. Taylor then takes a few steps backwards, towards Boyce, who is seated on a bench, and then quickly turns around and grabs Boyce as an officer enters pen B-4, presumably to retrieve an inmate. The two struggle as officers attempt to separate them. An officer sprays O.C. in Mr.

---

[3] Defendants' Response and Objections to Plaintiff's Requests for Admission, Ex. A, states that the entire video recording was retained and available to be viewed for approximately 20 days. Defendant Brantley testified that the video recordings are automatically destroyed after 60 days if not manually preserved by a DOC employee. Ex. D.

[4] A copy of all the remaining footage is included with this motion and attached as Exs. B and C to the Declaration of Katherine Rosenfeld.

Taylor's face. Boyce is escorted out of the cell. A few moments later, Mr. Taylor is escorted out and the recording ends.

Had it not been erased, the three hours between the Boyce Assault portion and the Use of Force portion (the "Destroyed Footage"), would have captured the entire incident that started with Mr. Boyce's first brutal blow at 12:20 p.m. and ended with Boyce and Mr. Taylor being removed from pen B-4 at 3:00 p.m. after the officers' subsequent use of force.

***Destruction of Three Hours of the Video Recording***

On May 24, 2011, Defendant Brantley reviewed the Boyce Assault portion, the Use of Force portion and the Destroyed Footage (together "the May 24, 2011 recording"), to investigate the use of force that occurred when correction officers sprayed O.C. in Plaintiff's face at approximately 3:20 p.m. on May 24, 2011. Ex. D at 86-87. At the time, Defendant Brantley was the Assistant Deputy Warden/Executive Officer at BXDC. Ex. D at 15.

The DOC video retention policies leave the decision of whether a recording is preserved or destroyed "solely up to the discretion of the individuals watching the video on that day." Ex. D at 118-119. The written policy regarding what should be saved is one paragraph long. The policy requires the preservation of "the actual use of force. And . . . the actual unusual incident." Ex. D at 110-111, 123; *see also* Ex. E. The policy is silent about "how much of a given incident an employee is obligated to preserve," "whether a Supervisor has to approve the decision to preserve or delete a given piece of video," and what to do with intervening footage when two incidents are separated by a period of time. Ex. D at 112. The policy does not require any litigation check before a recording is destroyed. *Id*. at 116.

The May 24, 2011 recording was digitally stored, accessible and viewable from Defendant Brantley's desk-top computer in her office at BXDC for at least 20 and at most 60 days after it was made. Ex. A at No. 3; Ex. D at 24-25, 83-85, 88. To preserve the May 24,

2011 recording for longer, she had to save it on a CD.   Defendant Brantley chose to save only the Boyce Assault portion and the Use of Force portion to a CD.  Ex. D at 86-87, 114.

Defendant Brantley and the Captain who investigated the officers' use of force created the investigation package within fifteen days of the incident.  Ex. D at 87-89.  The package included the Use of Force and the Boyce Assault portions of the May 24, 2011 recording.  *Id*. at 89.  Upon the completion of the investigation, the investigators recommended that Boyce be arrested for his assault on Mr. Taylor, *id*. at 89, making a criminal prosecution likely.  Defendant Brantley is and was aware that litigation often arises from incidents that result in severe injuries like the one suffered by Mr. Taylor.  *Id*. at 116-117.

## ARGUMENT

"A party seeking an adverse inference instruction (or other sanctions) based on the spoliation of evidence must establish the following three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind' and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) (citing *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 107-12 (2d Cir. 2001)).  Each of these three elements is met here.

## I.    DEFENDANTS HAD A DUTY TO PRESERVE THE UNEDITED, CONTINUOUS VIDEO RECORDING AS OF MAY 24, 2011, THE DATE OF THE INCIDENT

The obligation to preserve evidence arises when a party has notice that "the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to a future litigation.'"  *Matteo v. Kohl's Dep't Stores, Inc.*, No. 09 Civ. 7830 (RJS), 2012 WL 760317, at *3 (S.D.N.Y. Mar. 6, 2012) (quoting *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247

F.3d 423, 436 (2d Cir. 2001)).  This obligation arises when litigation is reasonably anticipated, which may be well before litigation is actually commenced.  *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 73 (S.D.N.Y. 1991) (citations omitted).  It can arise at the time of an incident that causes injury, even when the plaintiff does not file a lawsuit until long after the accident and the party typically only retains footage for a shorter period.  *See Slovin v. Target Corp.*, No. 12 Civ. 863 (HB), 2013 WL 840865, at *3 (S.D.N.Y. Mar. 7, 2013) (stating "Target was undoubtedly aware immediately following the fall that the video would likely be relevant to future litigation . . . the obligation arose at the time of the accident"); *Matteo*, 2012 WL 760317, at *3 (stating "at the time of the accident, Defendants could have expected Plaintiff to file a lawsuit"); *Siggelko v. Kohl's Dep't Stores, Inc.*, No. 06 Civ. 2281 (JS), 2009 WL 750173, at *3 (E.D.N.Y. Mar. 17, 2009) (stating "[a]ssuming that Plaintiff suffered some injury, Kohl's could have anticipated that Plaintiff would file a lawsuit shortly thereafter.").  In the context of video recordings of an incident causing injury, the preservation obligation is a "*duty to preserve an unedited version of the video, one that is continuous*."  *Slovin*, 2013 WL 840865, at *3 (emphasis added).

### A.    Defendants' Duty to Preserve Arose on May 24, 2011

Defendants' duty to preserve the May 24, 2011 recording arose on that date.  This case is directly analogous to two recent Southern District of New York cases, *Matteo v. Kohl's Dept. Stores, Inc.* and *Slovin v. Target Corp.*, in which Judge Sullivan and Judge Baer, respectively, held that a duty to preserve evidence arose at the time of the accident causing the plaintiff's injuries.  *Slovin*, 2013 WL 840865, at *3; *Matteo* 2012 WL 760317, at *3; *see also Siggelko*, 2009 WL 750173, at *3.  In each case, the plaintiff fell in the defendant's store.  *Slovin*, 2013 WL 840865, at *1; *Matteo*, 2012 WL 760317, at *1.  The *Matteo* plaintiff suffered a

fractured and dislocated shoulder; the *Slovin* plaintiff injured her left knee. *Slovin*, 2013 WL 840865, at *3; *Matteo*, 2012 WL 760317, at *1. The *Matteo* plaintiff filed her action approximately ten months after the incident; defendant claimed that video recordings were only retained for 60 days from the date of creation. *Matteo*, 2012 WL 760317, at *1. The *Slovin* plaintiff filed her lawsuit approximately four months after the incident; defendant claimed that video recordings were only saved for 30 days from the date of creation. *Slovin*, 2013 WL 840865, at *3. Because of the plaintiffs' injuries, both courts held that defendants should have reasonably anticipated that plaintiffs would bring lawsuits as of the dates of the accidents. *Slovin*, 2013 WL 840865, at *1; *Matteo*, 2012 WL 760317, at *3.

Here, Defendants should have reasonably anticipated litigation when they learned of Mr. Taylor's severe injuries on May 24, 2011. At the time of the incident, Defendant Brantley, who reviewed the May 24, 2011 recording, knew that inmate-on-inmate assaults resulted in litigation against the DOC. Ex. D at 116-117. Lawsuits involving inmate violence are regularly brought against the DOC. *See, e.g.*, Compl. ¶¶ 30-34. And Mr. Taylor's injuries were even more severe than the plaintiffs' injuries in *Matteo* and *Slovin*. Mr. Taylor's jaw was broken in several places, requiring surgery and hospitalization. Defendants should have reasonably anticipated this action. *See* Ex. F, Transcript of Oral Argument, March 28, 2012, at 14, *John v. City of New York, et al.*, No. 11 Civ. 5610 (RPP) (the Court asked the City with regard to its duty to preserve video recordings, "Aren't all assaults [on inmates] effectively going to be litigated . . . are claims made against the city?").

The injury Mr. Taylor suffered was so severe that Defendant Brantley and DOC staff recommended criminal prosecution of Boyce. They made this recommendation about fifteen business days after the incident – before the Destroyed Footage was deleted. After

acknowledging that the conduct could be criminal, Defendants could and should have anticipated the current action. Just over two months after the incident, a Notice of Claim was filed.

Defendants could have reasonably anticipated litigation when they learned of Mr. Taylor's severe injuries on May 24, 2011. Their obligation to preserve the continuous, unedited May 24, 2011 recording arose at that time.

## B. Defendants Had A Duty to Preserve A Continuous, Unedited Video

Defendants had a "duty to preserve an unedited version of the video, one that is continuous and certainly longer" than the two brief portions they extracted. *See Slovin*, 2013 WL 840865, at *3. Defendants cannot "eschew [their] obligation by arguing that [they] had no duty to preserve 'additional' surveillance footage beyond the [Boyce Assault and Use of Force portions] and by informing the Court that [the DOC] routinely recycles video footage within [20] days." *See Slovin.*, 2013 WL 840865, at *3.

The May 24, 2011 recording depicted an ongoing incident that started with Boyce's brutal punch at 12:20 p.m. and ended, *three hours later*, with the two still locked in the same pen together and the officers' use of chemical spray to break up another struggle between Boyce and Mr. Taylor. That Boyce's mistreatment, intimidation, and abuse of Plaintiff – and Defendants' failure to protect Plaintiff from such – went beyond the first event and spanned the entire three hour period is evident. The Boyce Assault portion cuts off in the midst of a confrontation between Boyce and Mr. Taylor. It resumes with Mr. Taylor, injured, in front of pen B-4's door, and facing towards where the officers were stationed. The intervening footage contained details relevant to this lawsuit. Defendants were required to save the video recording of the entire three-hour incident.

Defendants' obligation to preserve the May 24, 2011 recording was triggered when they learned of Boyce's assault on Mr. Taylor. The obligation required preservation of the

continuous, unedited footage, not only excerpts deemed relevant by an officer who is an interested party, potentially liable in the current action. Not a single individual reviewed the Destroyed Footage to determine if it would be relevant to reasonably anticipated litigation. Preserving the Destroyed Footage would have presented a *de minimu*s burden for Defendants – they needed only to copy the Destroyed Footage to a CD in the same manner they did for the Boyce Assault and Use of Force portions. No additional time was required to make such a copy. And now Plaintiff, the Court, and the jury are deprived of an opportunity to view the Destroyed Footage for the purpose of this federal civil rights action.

## II. DEFENDANTS WERE CULPABLE IN FAILING TO PRESERVE THE UNEDTIED, CONTINUOUS VIDEO RECORDING

"Once the duty to preserve attaches, any destruction of [evidence] is, at a minimum, negligent." *Zubulake*, 220 F.R.D. at 220; *see also Slovin*, 2013 WL 840865, at *3. Negligence satisfies a 'culpable state of mind' for purposes of a spoliation inference. *Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 290 (S.D.N.Y. 2009) ("In this circuit, a 'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence.").

Defendants were grossly negligent in failing to preserve the May 24, 2011 recording. Defendant Brantley testified that it is within the sole discretion of the officer reviewing the recording to determine how much of an incident to preserve. Ex. D at 118-119. The DOC guidelines on video retention are a mere paragraph long. Ex. E. They offer no guidance on what to preserve. Ex. D at 112. There is no requirement that the DOC staff person who reviews recordings make a preliminary, basic check with anyone else (such as DOC Legal) regarding whether litigation is pending or anticipated. Ex. D at 116. The *ad hoc* system of video retention and the DOC's lack of guidance predictably led to the destruction of relevant evidence. Remarkably, this lack of adequate policies and procedures exists although the DOC's 30(b)(6)

designee for testimony on video retention acknowledged that these preservation decisions are significant ones. Defendant Brantley agreed at her deposition that "the decision about what portions of video surveillance to review after an unusual incident or use of force is an important decision . . . that can have important implications . . . for the DOC's [and Federal] investigation." Ex. D at 137-138.

Multiple DOC employees knew that the May 24, 2011 recording depicted Mr. Taylor locked in pen B-4 for three hours with his attacker while correction officers continuously entered and exited the cell to remove other inmates. These officers ignored Plaintiff and his visibly broken jaw and failed to act to remove him from the cell. Still, aside from Defendant Brantley, not a single individual reviewed the Destroyed Footage to determine whether it would be relevant to anticipated litigation. The lack of review exemplifies Defendants' total disregard of their duty to preserve relevant evidence and constitutes gross negligence.

Defendants' destruction of the May 24, 2011 recording was negligent, and grossly so, considering the number of DOC staff who were aware of it, the failure of any other staff member aside from Defendant Brantley to review the Destroyed Footage, and the acknowledged seriousness of the assault by Boyce. Defendants' lack of adequate policies concerning their duty to preserve continuous, unedited footage demonstrates their blatant disregard for this duty. Significantly, just last week, Judge Engelmayer issued an Order expressing substantial concern about DOC's video retention and preservation policy. *See* Ex. G, Order dated May 30, 2013, *Tafari v. City of New York et al.*, No. 13 Civ. 1733 (PAE) (stating "the Court is troubled by . . . (2) the apparent lack of an document or evidence-preservation protocols put in place by defense counsel or DOC counsel since filing this lawsuit . . . "). Defendants' gross negligence satisfies the culpable state of mind requirement for spoliation sanctions.

## III.    THE DESTROYED FOOTAGE WAS RELEVANT

Defendants' gross negligence in failing to preserve the Destroyed Footage "'suffice[s], standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party'" and "supports a finding of relevance as a matter of law." *Slovin*, at *6 (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002)).  Even if Defendants are presumed to have been merely negligent in the destruction of the May 24, 2011 recording, and a showing of relevance is also required, the Destroyed Footage is relevant.

During those three hours, Mr. Taylor remained locked in pen B-4 with his attacker.  The Destroyed Footage contains the evidence of Mr. Taylor's allegations that he was knocked unconscious from a forceful blow by Boyce, that he was on the floor, unconscious, in view of Defendants John Doe #1-4, and that he was repeatedly kicked and hit by other inmates for several minutes.  Compl. ¶ 54.  The Destroyed Footage would also show that when Mr. Taylor regained consciousness, he was spitting blood out of his mouth and wobbling on his feet, and that other Bloods members were congratulating Boyce.  Compl. ¶¶ 55-57.  Finally, the Destroyed Footage would show that correction officers were entering the cell continuously during the intervening three hours between the Boyce Assault and the Use of Force portions to bring inmates to court appearances, establishing that they were aware of Mr. Taylor's extraordinary injuries and elected to do nothing about them.  Compl. ¶ 59.

Even Defendants agree that the Destroyed Footage contained important information.  As Defendant Brantley testified, "it was important for [her] to see all three hours of the footage" for her investigation into the officers' use of the O.C. spray on Mr. Taylor.  Ex. D at 51-52.  Likewise, it was important for Plaintiff to see the Destroyed Footage to substantiate his claims.  To take one example, Mr. Taylor was treated for a broken jaw on both sides of his face.  The Boyce Assault and the Use of Force portions only show a blow to his right side.  On the

Destroyed Footage, there was likely evidence of how Mr. Taylor sustained a broken jaw on his left side as well.

Defendant Brantley viewed the Destroyed Footage to determine if "[her] staff had followed DOC policies in that time-period," if "the pen was being adequately supervised," if Mr. Taylor "made any contact with any Correction Officer during those three hours" or "asked for assistance or made any indication that he was in distress," or "if anybody else was involved with the incident." Ex. D at 51-53. These matters are all relevant to Mr. Taylor's claim that the DOC staff failed to protect him over the course of three hours and were complicit with the inmates who attacked him. Defendant Brantley reached certain conclusions regarding these questions based on her review of the Destroyed Footage. In her *sole discretion*, she concluded, however, that the Destroyed Footage showed no staff misconduct and, therefore, it was not necessary to save for *her* investigation of the officers' use of force. Neither Plaintiff nor anyone else had the opportunity to reach any independent conclusion about these matters.

Although she viewed it twice, Defendant Brantley did not pay attention to aspects of the Destroyed Footage relevant to this action. Defendant Brantley testified, for instance, that she "wouldn't be looking for [gang] signs being exchanged between Mr. Boyce and the Officers" and that "inmates exchanging gang signs . . . was not something that was in the forefront of [her] mind" when she reviewed the recordings. Ex. D at 78-79. She also was "not counting at the time how many times [officers came to the door of pen B-4 for inmates]." Ex. D at 55-56. Defendant Brantley could not recall the time at which she observed Mr. Taylor talking to other inmates in pen B-4, whether she saw Mr. Taylor speak to any correction officers, how long each officer stood at the pen B-4's door when he called inmates to exit for court appearances, or whether any other inmates went to the back corner of the cell where Taylor was laying down.

Ex. D at 58, 63-64, 66. She also claimed not to have noticed Mr. Taylor's injuries, or any signs that he was injured in the Destroyed Footage. Ex. D at 62-63. *Defendant Brantley also did not interview or speak with a single individual depicted on the May 24, 2011 recording after she watched it*. Ex. D at 106. It is impossible to corroborate if she even watched the Destroyed Footage.

Defendants' redaction of the May 24, 2011 recording prevents the Plaintiff, the Court, and the jury from directly observing the circumstances of the Boyce assault and the alleged subsequent disregard of DOC staff to Plaintiff's injuries and safety. The Destroyed Footage is relevant. Having established this final requirement for spoliation sanctions, sanctions are appropriate.

## IV. AN ADVERSE INFERENCE, PRECLUSION, AND FEES ARE APPROPRIATE SANCTIONS

"A district court has broad discretion in crafting a proper sanction for spoliation to serve 'the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine.'" *Slovin*, 2013 WL 840865, at *6 (quoting *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999)). Sanctions should "'(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore "the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."'" *Slovin*, 2013 WL 840865, at *6 (*quoting West*, 167 F.3d at 779 (quoting *Kronisch v. United States*, 150 F.3d 112,126 (2d Cir. 1998)). To fully realize these aims and protect the injured party from prejudice, while imposing a tailored remedy, the court can combine alternative sanctions. *See, e.g., West*, 167 F.3d at 780. A court "'should not shrink from imposing harsh sanctions where . . . they are clearly warranted.'" *Great N. Ins. Co. v.*

*Power Cooling, Inc.*, No. 06 Civ. 874 (ERK) (KAM), 2007 WL 2687666, at *7 (E.D.N.Y. Sept. 10, 2007).

Plaintiff requests that the Court issue the following sanctions: (1) an instruction permitting the jury to presume that the Destroyed Footage would have corroborated Plaintiff's version of events as alleged in paragraphs 54-57 and 59 of the Complaint, (2) preclusion of Defendants from offering evidence as to what the Destroyed Footage purportedly showed, and (3) the fees incurred in association with the filing of this motion.

### A. The Court Should Grant an Adverse Inference

"[A] prejudiced party may be permitted an inference in his favor so long as he has produced some evidence suggesting that [evidence] relevant to substantiating his claim would have been included among the destroyed [footage]." *Kronisch*, 150 F.3d at 128. In the range of permissible sanctions for spoliation, an adverse inference is relatively modest. *See, e.g.*, *Pension Comm. of Univ. Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 469 (S.D.N.Y. 2010) ("The choices include – from least harsh to most harsh – further discovery, cost-shifting, fines, special jury instructions, preclusion, and the entry of default judgment or dismissal (terminating sanctions)") (*abrogated on other grounds by Chin v. Port Auth. of New York & New Jersey*, 865 F.3d 135 (2d Cir. 2012)). Here, even in light of Defendants' gross negligence, Plaintiff requests that the Court impose the least harsh instruction which "*permits* (but does not require) a jury to *presume* that the lost evidence is both relevant and favorable to the innocent party" in that it would demonstrate that the facts alleged in paragraphs 54-57 and 59 of the Complaint are true. *Id.* at 470 (emphasis in the original).

This inference, coupled with preclusion as set forth below, serves to deter Defendants from destroying relevant video recordings in the future and restores Plaintiff to the same position Plaintiff would occupy absent Defendants' spoliation. *West*, 167 F.3d at 779.

### B.    The Court Should Preclude Evidence Relating to the Destroyed Footage and Its Review

Preclusion is a particularly appropriate remedy for spoliation where "it can be tailored to mitigate the specific prejudice that the [non-spoliating party] would otherwise suffer." *In re WRT Energy Sec. Litig.*, 246 F.R.D. 185, 200 (S.D.N.Y. 2007). Plaintiff seeks a preclusion order narrowly tailored to bar evidence or testimony relating to the Destroyed Footage, or any Defendants' or their employees' review thereof. Preclusion, coupled with an adverse inference, would "best serve the trifold aims of a spoliation sanction." *Great N. Ins. Co.*, 2007 WL 2687666, at *14; *see also* Ex. F, Oral Order of Judge Patterson, Transcript of Oral Argument, March 28, 2012, at 17, *John v. City of New York, et al.*, No. 11 Civ. 5610 (RPP) (ordering preclusion); *West*, 167 F.3d at 780 (suggesting preclusion of evidence regarding spoliated evidence was appropriate remedy); *M & T Mortg. Corp. v. Miller*, No. 02 Civ. 5410 (NG), 2007 WL 2403565, at *12 (E.D.N.Y. Aug. 17, 2007) (precluding evidence or testimony about spoliated evidence); *Donato v. Fitzgibbons*, 172 F.R.D. 75, 84 (S.D.N.Y. 1997) (same).

Here, Plaintiff would be prejudiced by any evidence or testimony that Defendants might seek to introduce relating the Destroyed Footage or its subject matter. As stated, only Defendant Brantley viewed the Destroyed Footage. Should Defendant Brantley testify, a juror is likely to be greatly influenced by such testimony. Plaintiff cannot cross-examine Defendant Brantley as to what she reviewed because the relevant impeachment material has been destroyed, *by the witness herself*. Nor can Plaintiff offer any competing witnesses to comment on what the tape showed. *Compare with DeMeo v. Kean*, 754 F. Supp. 2d 435, 450 (N.D.N.Y. 2010) (denying request for preclusion where plaintiff's investigator had viewed the video destroyed by defendant and could testify about it). To allow one-sided testimony about a recording that Defendants destroyed before Plaintiff could review it would be unfairly prejudicial. *See Aiello v.*

*Kroger Co.*, No. 08 Civ. 01729 (HDM), 2010 WL 3522259, at *3 (D. Nev. Sept. 1, 2010) (precluding testimony about a destroyed surveillance video, as plaintiff "was never given the opportunity to inspect the video and any testimony from the spoliating party regarding the content of the video would be unreliable and unfairly prejudicial").

Defendant Brantley's testimony about the Destroyed Footage also raises significant credibility concerns: her memory is faded, and she has weighty interests at stake to characterize the Destroyed Footage in a manner that is favorable to her and her co-defendants.

Defendant Brantley admitted at her deposition that it was difficult to remember the contents of the Destroyed Footage. Ex. D at 54, 55, 57, 58, 64, 134-135. Even Defendant Brantley's memory of what footage she did save (the Boyce Assault and Use of Force portions), which Defendant Brantley watched at the start of her deposition, was not accurate. *See*, *e.g*., Ex. D at 135. It is unlikely that her memory of the Destroyed Footage is reliable, since she watched it two years ago.

Just one example of Brantley's unreliable memory is that she first testified that the officers could not have known of Mr. Taylor's injuries, despite entering pen B-4 many times over the course of three hours, because Mr. Taylor never faced them. But, the Use of Force portion starts with Mr. Taylor facing the officers' post. Ex. C. Mr. Taylor's face was in full view of the officers outside of the pen, and of any officer who came to the door. There is no footage depicting how long Mr. Taylor was standing facing the officers. That information is contained in the Destroyed Footage. The Destroyed Footage would also resolve Defendants' incredible claims that no officer who entered pen B-4 for three hours saw Mr. Taylor's injuries.

The basis for Defendant Brantley's opinion that the officers would not have been able to see Mr. Taylor's injuries when they entered pen B-4 changed even over the course of her

three-hour deposition. Ex. D at 69-70, 138-142. First, she said that Mr. Taylor was standing to the right of the door, so officers would only be able to see his left side. Ex. D at 69-70. But after Defendant Brantley was shown the Use of Force portion again at the end of the deposition, she decided that the officers would not have been able to see Mr. Taylor's injuries because Mr. Taylor was positioned in the middle of pen B-4, with his back to the door. Ex. D at 138-142. According to Defendant Brantley, Mr. Taylor stood in the middle of the pen, facing away from the camera (and towards, and directly in front of Boyce) for the entire three hours of the Destroyed Footage. But the Use of Force portion begins with Mr. Taylor in a completely different position. The inconsistencies in Defendant Brantley's memory of the footage that she viewed at her own deposition demonstrate that relying on an interested party's two-year old memory of the Destroyed Footage would be prejudicial to Plaintiff.

In light of the foregoing, preclusion of evidence or testimony relating to the Destroyed Footage or its subject matter, coupled with a jury instruction that facts alleged in paragraphs 54-57 and 59 of the Complaint are presumed true, is appropriate.

### C. Attorneys' Fees Should Be Awarded

Where a court finds spoliation, reimbursement for the fees incurred in making the motion should be awarded. *See, e.g.*, *Casale v. Kelly*, 710 F. Supp. 2d 347, 367 (S.D.N.Y. 2010); *Richard Green (Fine Paintings)*, 262 F.R.D. at 292; *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 444 (S.D.N.Y. 2009); *Pastorello v. City of New York*, No. 95 Civ. 470 (CSH), 2003 WL 1740606 (S.D.N.Y. Apr. 1, 2003). "[S]uch an award serves the remedial purpose of compensating the plaintiff for the reasonable costs it incurred in bringing this motion." *Richard Green (Fine Paintings)*, 262 F.R.D. at 292. The Court should award Plaintiff the attorneys' fees and costs incurred in connection with this motion. *Accord Slovin*, 2013 WL 840865, at *7.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court grant an adverse inference that permits the jury to presume that the video recording would have corroborated his testimony, award attorneys' fees related to this motion, and any further relief deemed appropriate and proper.

Dated: June 7, 2013
      New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP


_____/s/_____
Katherine Rosenfeld
Jonathan S. Abady
Zoe Salzman
Jill Maxwell

75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

THE LEGAL AID SOCIETY
PRISONERS' RIGHTS PROJECT

Jonathan S. Chasan
Mary Lynne Werlwas
199 Water Street, 6th Floor
New York, New York 10038
(212) 577-3530


*Attorneys for Plaintiff*
