UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
DWAINE TAYLOR

                Plaintiff,                         **12 CIV 5881 (RPP)**

        -against-                  **OPINION & ORDER**

CITY OF NEW YORK, et al.,

                Defendants.

-------------------------------------------------------x

**ROBERT P. PATTERSON, JR., U.S.D.J.**

### I.      INTRODUCTION

On July 31, 2012, Plaintiff Dwaine Taylor[1] ("Plaintiff") filed a 42 U.S.C. § 1983 action against the City of New York, the New York City Department of Correction ("DOC"), Supervising Warden Arthur Olivari, Chiefs of Department Larry W. Davis, Sr. and Michael Hourihane, Warden William Clemons, Deputy Warden Turham Gumusdere, Assistant Deputy Warden Jacqueline Brantley, and John Doe Officers Nos. 1-7 (collectively, "Defendants").  The Complaint alleges that inmates associated with the Bloods gang assaulted and injured Plaintiff while he was in DOC custody on May 24, 2011 and also on November 6, 2011.  (Compl. ¶¶ 1-7, 124.)  The Complaint further alleges that these assaults were carried out under a widespread practice called "the Program," whereby, as a means of controlling those held in custody, DOC officers permitted inmates associated with the Bloods to attack other inmates, such as Plaintiff, who were not associated with the gang.  (See id. ¶¶ 2, 26-42, 127, 130, 135.)  Plaintiff's suit raises three principal causes of action: (1) a Monell claim against the City of New York; (2) a

---

[1] Plaintiff is also known as Dusetree Taylor.  (See Compl. ¶ 12, ECF No. 1.)

failure to intervene and/or protect claim against the individual DOC officers; and (3) a negligence claim against all Defendants.  (Id. ¶¶ 123-37.)

On June 7, 2013, Plaintiff filed the now pending motion for sanctions for spoliation of evidence.  (See Pl.'s Mot. for Sanctions, ECF No. 23; see also Pl.'s Mem. in Supp. of Mot. for Sanctions ("Pl.'s Mem."), ECF No. 25.)  Plaintiff's motion argues that Defendants breached their duty to preserve approximately three hours of video surveillance footage relevant to Plaintiff's litigation concerning the May 24, 2011 assault.  In response, on June 28, 2013, Defendants filed an opposition memorandum asserting that they had no duty to preserve the surveillance footage because Plaintiff had not given them any notice of his lawsuit until after the footage was deleted. (Defs.' Mem. in Opp'n to Pl.'s Mot. for Sanctions ("Defs.' Mem.") at 4-10, ECF No. 28.) Defendants also argued that, even if they did have a duty to preserve the surveillance footage, they met this obligation by saving eight minutes of footage deemed by them to be relevant to their investigation of Plaintiff's assault.  (Id.)  Plaintiff filed a reply memorandum on July 12, 2013, (Pl.'s Reply Mem. in Supp. of Mot. for Sanctions ("Pl.'s Reply Mem."), ECF No. 31), and the Court held oral argument on August 2, 2013, (see Hr'g Tr., Aug. 2, 2013, ECF No. 35).

After considering the parties' arguments and for the reasons that follow, this Court orders that: (1) Plaintiff's request to preclude Defendant Brantley from testifying as to what she observed when she reviewed the now-deleted three hours of surveillance footage is GRANTED; (2) Plaintiff's request for an adverse inference instruction which would permit, but would not require, the jury to presume that the deleted surveillance footage would have corroborated Plaintiff's version of the events as alleged in paragraphs 54-57 and 59 of the Complaint is GRANTED; and (3) Plaintiff's motion for reasonable attorney's fees and costs in connection with this motion is GRANTED.

## II.        RELEVANT FACTUAL BACKGROUND

### A.        The May 24, 2011 Assault on Plaintiff

The incidents giving rise to Plaintiff's lawsuit against Defendants date back to May 2011, when Plaintiff was twenty-five years old and a detainee at the Robert N. Davoren Complex ("RNDC") on Rikers Island.  (See Compl. ¶¶ 3-4, 12, 43-44.)  Specifically, the Complaint alleges that, in connection with a court appearance on May 24, 2011, DOC officers transported Plaintiff from the RNDC to the Bronx Criminal Courthouse, (id. ¶ 47); that, while at the Courthouse, Plaintiff was placed in a holding cell designated "Pen B-4," (id.; see also Pl.'s Mem. at 4); that approximately sixteen to seventeen other inmates were also in the holding cell at that time, (Compl. ¶ 47); that among those being held in the cell was Batise Boyce,[2] an inmate known to be a member of the Bloods gang, (id. ¶ 52); that "shortly after entering the holding cell," Plaintiff placed his hand on the cell door and stood "in plain sight" of DOC Officers John Doe #1-4, (id. ¶ 51); that while Plaintiff was standing in plain sight of DOC Officers John Doe #1-4, Boyce "viciously punched" him in the face, knocking him to the ground and causing him to lose consciousness, (id. ¶¶ 3, 51-54); that, while Plaintiff was on the ground, six other inmates associated with the Bloods also hit and kicked him, (id. ¶¶ 54-55); that, when Plaintiff stood back up, blood gushed from his nose and he started spitting blood and he could feel that his jaw was injured, (id. ¶56); and that one Bloods member threatened him with a knife and told him not to say anything about what had just happened, (id. ¶ 58).

The Complaint further alleges that DOC officer John Doe #1 came into the holding cell and saw Plaintiff covered in blood and spitting blood from his mouth, (id. ¶¶ 54-55); that, instead of providing assistance, DOC officer John Doe #1 and the other DOC officers who had observed

---

[2]In the Complaint, Plaintiff alleges that his assailant was Baptiste Boyce, (Compl. ¶ 52), but both parties' papers refer to him as Batise, (compare Pl.'s Mem. at 4 with Defs.' Mem. at 2), and so the Court adopts this spelling here.

Boyce punch Plaintiff, kept Plaintiff in Pen B-4 with Boyce for approximately three more hours, (id.); that "since no correction officers were coming to his assistance," Plaintiff decided to get their attention by grabbing Boyce, (id. ¶ 61); that an altercation with Boyce then ensued, (id.); that DOC officers rushed into the cell to break up the fight, (id. ¶ 62); that one officer separated the two men by spraying mace into Plaintiff's face, (id.); and that the officers then moved Plaintiff to another holding cell, where he drafted a statement describing the incidents that had occurred in Pen B-4, (id. ¶¶ 64-68).

    Although Defendants contend that Plaintiff was not visibly injured when they removed him from the Pen B-4 holding cell,[3] (see Defs.' Mem. at 6), Plaintiff claims that one officer told him that "it looked like his jaw was broken," (Compl. ¶ 67). A few hours after being removed from Pen B-4, Plaintiff was taken from the Bronx Criminal Courthouse to the emergency room at Lincoln Hospital. (Id. ¶ 69; see also Defs.' Answer to Compl. ("Answer") ¶ 69, ECF No. 7.) At the hospital, he was diagnosed with jaw fractures on both the right and left sides of his face. (Compl. ¶¶ 69-70.) One of his teeth was found to be impacted and another tooth was loose. (Id. ¶ 70.) Plaintiff underwent surgery to address these medical issues the next day. (Id. ¶¶ 70-73.) During the surgery, doctors closed Plaintiff's jaw fractures with a metal plate and screws, removed one of Plaintiff's teeth, and wired his jaw shut. (Id. ¶ 73.) Plaintiff remained at Lincoln Hospital for three days. (Id. ¶ 74.) Then, on or about May 29, 2011, DOC officers transported him to the North Infirmary Command on Rikers Island, (id. ¶ 75; see also Answer ¶ 75), where he remained for at least another month, (Compl. ¶ 79).

---

[3]In support of their claim that Plaintiff was not visibly injured following the assault, Defendants submitted an "Incident Photo" Report that includes five color photographs taken of Plaintiff on May 24, 2011 at some point after he was removed from Pen B-4. (See Decl. of Diep Nguyen in Supp. of Defs.' Opp'n to Pl.'s Mot. for Sanctions ("Nguyen Decl.") Ex. B, ECF No. 29.) The Report includes pictures of Plaintiff's shirtless torso and face from the front, back, left, and right sides, and also includes a close-up of Plaintiff's face. The photo of Plaintiff's front side is inexplicably darker than the others.

**B.**     **The Surveillance Video Footage**

On May 24, 2011, the day that Plaintiff was assaulted, a ceiling-mounted, twenty-four hour surveillance camera was being used to record the events taking place in the Pen B-4 holding cell.  (See Decl. of Katherine Rosenfeld in Supp. of Mot. for Sanctions ("Rosenfeld Decl.") Ex. D ("Brantley Dep. Excerpt") at 4-5, ECF No. 24.)  On the same day as the assault, Defendant Brantley—then the Assistant Deputy Warden Executive Officer at the Bronx Criminal Courthouse—reviewed the video footage that this surveillance camera had recorded.  (Id. at 3, 6.)  At a deposition on April 13, 2013, Defendant Brantley described her review of this footage.[4]

First, Defendant Brantley stated, she watched the use of force footage recorded between 3:00 and 3:15 p.m., which showed Plaintiff grabbing Boyce and the DOC officers using mace to separate the two men.  (See Decl. of Katherine Rosenfeld in Further Supp. of Mot. for Sanctions ("Rosenfeld Reply Decl.") Ex. J ("Brantley Dep. Excerpt") at 2-4, ECF No. 32.)  Defendant

---

[4]Defendant Brantley was deposed pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure after this Court issued an order concluding that "no written policy or procedures exist at the [DOC], with respect to the retention and preservation of video recordings of assaults and other similar incidents."   (Order, Mar. 13, 2013, ECF No. 16.)  At her deposition, Defendant Brantley testified that the DOC requires an officer to "preserve any video surveillance related to and/or that shows an unusual incident or use of force."  (Rosenfeld Decl. Ex. D at 41.)  According to Defendant Brantley, the policy leaves the decision to preserve surveillance footage "solely up to the discretion of the individual watching the video on that day" and it is silent on a number of related issues, including how much footage of a given incident an employee is obligated to preserve or what to do with intervening footage when two related incidents are separated by a period of time.  (Id. at 41-42; see also id. at 39-43.)

In addition to Defendant Brantley's testimony about the DOC's video retention and preservation procedures, a copy of a DOC memo titled, "Access to Video Recordings, Re: Investigating Captains" has also been submitted. (Rosenfeld Decl. Ex. E.)  The memo, dated November 26, 2008, directs that "[a]ll available video recorded evidence of incidents (including Use of Force incidents) shall be made available to the captain assigned to investigate the incident."  (Id. at 1 (emphasis in original).)  The memo further directs that the assigned Tour Commander, the Commanding Officer, and the Deputy Warden for Security, shall "personally review all related reports, evidence, and any Video Recordings associated with a use of force incident."  (Id. at 2.)  The memo does not, however, address any specific procedures regarding the long-term preservation of these video recordings, nor does it define the scope of what it means for a video recording to be "associated with a use of force incident."  (Cf. id. at 1-2; see also Rosenfeld Decl. Ex. D. at 36-37.)

Brantley explained that she then saved approximately four minutes of this footage onto a CD (the "Use of Force Footage").[5]  (See id.; see also Rosenfeld Decl. Ex. C.)

Next, Defendant Brantley stated that, to understand what if anything had caused Plaintiff to grab Boyce, she watched the footage backwards and saw that, at 12:22 p.m., Boyce had punched Plaintiff.[6]  (Rosenfeld Reply Decl. Ex. J at 2-4.)  Defendant Brantley further explained that she then watched the three hours of video surveillance footage forwards from when Boyce punched Plaintiff to when the Use of Force Footage ended.  (Id.)  After doing so, she used a second CD to save four minutes of the footage depicting Boyce's assault on Plaintiff (the "Assault Footage").[7]  (See id.; see also Rosenfeld Decl. Ex. B.)

Defendant Brantley testified that she had watched the three hours of surveillance footage between the Assault Footage and the Use of Force Footage "more than twice" because she

---

[5]The Use of Force Footage shows Plaintiff in the Pen B-4 holding cell, leaning face-forward against the cell door and scanning the corridor.  Boyce can be seen sitting on a bench in the back left corner evidently talking to the two other inmates in the cell.  After twenty-seven seconds, an inmate walks down the corridor and pauses in front of Pen B-4.  A DOC officer then appears and unlocks the door to the holding cell.  As the officer opens the door, Plaintiff takes a few steps back and lunges for Boyce.  Boyce responds by grabbing Plaintiff by the shoulders.  Two more DOC officers arrive on the scene, usher the other two inmates out of the cell, and then approach Boyce and Plaintiff, who are entangled with their arms around each other.  The officers briefly try to separate the two men before one officer pulls out a container from his waistband and aims it at Plaintiff's face.  Plaintiff immediately lets go of Boyce and moves quickly to the door, but an officer standing at the door pushes Plaintiff back into the cell and he moves to the right corner of the cell.  Boyce is then directed to leave the cell and is handcuffed.  Moments later, Plaintiff exits the cell and is also handcuffed.  (See Rosenfeld Decl. Ex. C.)

[6]At the hearing, Defense counsel stated that, on the day of the assault, Defendant Brantley reviewed the footage preceding the Use of Force Footage after "it was found out that Plaintiff had suffered a broken jaw" because the Use of Force footage did not show any action that would have caused such an injury.  (Hr'g Tr. at 16.)

[7]The Assault Footage shows Plaintiff standing at the front of the Pen B-4 holding cell.  He is looking out into the corridor and occasionally glancing over his right shoulder.  Boyce can be seen sitting on a bench at the back of the cell, until at minute 2:35, he rises, raises his right hand, and punches Plaintiff on the right side of the face.  Boyce then grabs Plaintiff and shoves him out of the camera's view into the back right corner.  About forty-five seconds later, Plaintiff re-emerges and walks to the front of the cell.  Plaintiff can be seen standing with his back towards the corridor, while the other inmates form a semi-circle around him.  Approximately twenty seconds later, as Plaintiff is swiveling his head evidently to look at the other inmates, the footage ends.  (See Rosenberg Decl. Ex. B.)

wanted the incidents to "make sense in [her] mind."  (Rosenfeld Reply Decl. Ex. J at 2.)  She

specifically made clear:

> Q:   It was important for you to see all three hours of the footage; correct?
>
> A:   Yes.
>
> Q:   You needed to evaluate whether your staff had followed DOC policies in that time-period; is that correct?
>
> A:   Yes.
>
> Q:   You needed to see whether the pen was being adequately supervised for those three hours; correct?
>
> A:   Yes.
>
> Q:   Okay.  And you needed to make sure that the Officers were coming by at the time they were supposed to?
>
> A:   I was trying to see if [Plaintiff] had asked for assistance or made any indication that he was in distress.
>
> Q:   So, another reason you watched the three hours is because you wanted to check if [Plaintiff had] made any contact with any Correction Officer during those three hours?
>
> A:   Right. And [to see] if anybody else was involved.
>
> Q:   You both wanted to see if [Plaintiff had] asked for help, and if any other inmates were involved with the incident?
>
> A:   Yes.
>
> Q:   So, there were many reasons why you wanted to watch the time-period between the [Use of Force Footage and the Assault Footage]; correct?
>
> A:   Yes.

(Rosenfeld Decl. Ex. D at 7-8.)

    When asked what she had seen during the three hours of surveillance footage, Defendant

Brantley recalled that, subsequent to the footage showing Boyce hit Plaintiff, Plaintiff moved

immediately to the right-back corner of the holding cell, (see Rosenfeld Decl. Ex. D at 17, 50-51); that approximately four minutes later, Plaintiff emerged from the corner of the cell, (see Decl. of Diep Nguyen in Supp. of Defs.' Opp'n to Pl.'s Mot. for Sanctions ("Nguyen Decl.") Ex. A at 2, ECF No. 29); that, for the next three hours, Plaintiff stood at the front of the holding cell, with his back to the gate and occasionally spoke to other inmates, (id. at 4; Rosenfeld Decl. Ex. D at 11-12, 17-19); that where Plaintiff was standing at the front of the holding cell was near to the door through which the DOC officers summoned inmates for their court appearances, (Rosenfeld Decl. Ex. D at 12, 17-19, 50-51); that the DOC officers came to this door and summoned approximately sixteen inmates for court appearances, (id. at 8); and that whenever the officers came to the door, Plaintiff "seemed to move away" from them, (id. at 50-51).

At her deposition, Defendant Brantley could not remember the number of times that the DOC officers had come to Pen B-4 to summon inmates for their court appearances or how long they stood in front of the cell when they did so. (Id. at 9-13, 15-16.) Nor could she recall the nature or timing of Plaintiff's interactions with the other inmates or if Plaintiff had tried to speak to any DOC officers while in the holding cell. (Id.) Indeed, Defendant Brantley—who was the only person to review the full three hours of surveillance footage—reported that the details of the footage were "hard to remember" because several years had passed since she had watched it. (Id. at 16, 32-33.)

During the deposition, Defendant Brantley acknowledged that "the decision about which portions of video surveillance to review after an unusual incident . . . or use of force [wa]s an important decision," which could "have important implications down the road" in an internal DOC investigation, a federal investigation, or a civil lawsuit. (Id. at 46-47.) Defendant Brantley also stated that she was aware at the time she reviewed the surveillance footage that "inmates

often bring lawsuits against the [DOC] for things that happen in jail," especially if "they've been

beaten up."  (Id. at 39-41.)  Nonetheless, Defendant Brantley explained that, in this case, because

of the DOC's policy, she had preserved only the Use of Force Footage and the Assault Footage,

and had decided not to save all of the footage between the Assault Footage and the Use of Force

Footage because it did not depict "any other commotion" in the cell or any conversations

between Boyce and the DOC officers or between Boyce and any of the other inmates.  (Nguyen

Decl. Ex. A at 2; Rosenfeld Decl. Ex. D at 41.)  Defendant Brantley summarized that the footage

simply "wasn't needed for the investigation."  (Rosenfeld Decl. Ex. D at 23-25.)

When asked what had happened to the three hours of film footage intervening the Assault

Footage and the Use of Force Footage, Defendant Bradley stated that it likely had been viewable

from her computer for sixty days after the May 24, 2011 incident, (Rosenfeld Decl. Ex. D at 29);

but then, because the footage had not been expressly saved, she could "only assume that the

machine [had] re-cycle[d]" it, (id. at 27).  Defendant Brantley explained that she believed "the

machine" recycled footage every sixty days because "one time [she had] tried to go back to look

at something that was about ninety days old and it was not there; [and] then when [she] spoke to

Radio Shop, [which was responsible for maintaining the DOC video monitors and video

surveillance cameras,] they said it recycles every sixty days."[8]  (Id. at 27-29.)

---

[8]Notably, although Defendants designated Defendant Brantley as their Rule 30(b)(6) witness to testify as to the DOC's video preservation procedures and although Defendant Brantley testified that DOC video surveillance recordings were preserved for sixty days before being automatically deleted, Defendants now contend that Defendant Brantley was "mistaken" in her description of the agency's procedures.  (See Defs.' Mem. at 7 n.2.)  In fact, without submitting any evidence in support of this contention, Defendants state that it is the DOC's practice to automatically delete surveillance footage twenty days after it is recorded.  (Id. at 7; see also Rosenfeld Decl. Ex. A ("Defs.' Resps. & Objections to Pl.'s Requests for Admis.") at 5.)

### C.      Legal Proceedings Arising from the May 24, 2011 Incident

During her deposition, Defendant Brantley testified that, at some point within fifteen business days of the May 24, 2011 assault on Plaintiff, she had helped to prepare an investigation "package" recommending that Boyce be "re-arrested" for assaulting Plaintiff.[9]   (Rosenfeld Decl. Ex. D at 33.)   The DOC's investigation package included copies of the Assault Footage and the Use of Force Footage and was sent on to the Bronx District Attorney's Office.   (See Hr'g Tr. at 20; see also Defs.' Mem. at 8-9.)   As part of the DOC's investigation into the incident, a DOC investigator interviewed Plaintiff at the North Infirmary Command.   (Compl. ¶¶ 76-77; see also Answer ¶¶ 76-77.)   During the interview, the DOC investigator asked Plaintiff if he wanted to press charges against Boyce, and Plaintiff told him that he did want to do so.   (Id.) Approximately one week later, Plaintiff met with a Bronx Assistant District Attorney.   (Id.)   The Bronx District Attorney's Office subsequently convened a grand jury hearing, at which Plaintiff testified, and Boyce was indicted on criminal charges, which remain pending.   (Compl. ¶ 78; Answer ¶ 78; see also Hr'g Tr. at 20.)

On July 28, 2011, approximately sixty-five days after the May 24, 2011 incident, Plaintiff filed a Notice of Claim against the City of New York.   (Rosenfeld Reply Decl. Ex. K.) Plaintiff's civil rights suit followed on July 31, 2012.   When asked if she was "surprised to learn that Dwaine Taylor had filed a lawsuit based on what [had] happened to him," Defendant Brantley answered, "I can't say I was surprised.   I knew that I recognized the name."   (Rosenfeld Reply Decl. Ex. J at 6-7.)

---

[9]At the hearing, Defendants represented that DOC officers arrested Boyce on May 24, 2011 "as soon as the facts came to light" on the same day that the assault had occurred, (Hr'g Tr. at 14), which may explain the "re-arrest" terminology that Defendant Brantley used in her deposition.

### III.     DISCUSSION

### A.     <u>Spoliation</u>

The Second Circuit defines spoliation as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  <u>West v. Goodyear Tire & Rubber Co.</u>, 167 F.3d 776, 779 (2d Cir. 1999).  A party seeking sanctions for spoliation of evidence must establish the following three elements: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim . . . such that a reasonable trier of fact could find that it would support that claim."  <u>Residential Funding Corp. v. DeGeorge Fin. Corp.</u>, 306 F.3d 99, 107 (2d Cir. 2002) (internal quotation marks omitted).  If the moving party proves each of these elements in the context of a discovery order violation, then a court has authority to impose sanctions under Rule 37 of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 37(b).  Absent a discovery order violation, a court may impose sanctions for the spoliation of evidence pursuant to "its inherent power to manage its own affairs."  <u>See</u> <u>Residential Funding</u>, 306 F.3d at 106-07.

#### 1.   <u>Duty to Preserve Evidence</u>

"The obligation to preserve evidence arises when [a] party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."  <u>Fujitsu Ltd. v. Fed. Exp. Corp.</u>, 247 F.3d 423, 436 (2d Cir. 2001).  The duty requires that "anyone who anticipates being a party or is a party to a lawsuit . . . not destroy unique . . . evidence that it knows, or reasonably should know, is relevant in the action."  <u>Zubulake v. UBS Warburg, LLC</u>, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (internal quotation

marks omitted).

### a. *When Defendants' Preservation Duty Arose*

Defendants' duty to preserve evidence relevant to Plaintiff's litigation concerning the May 24, 2011 assault arose within a week of the assault and thus within the twenty-day period that the DOC maintained surveillance footage before erasing it.  (*See* Defs.' Mem. at 7.) Defendants should have reasonably anticipated that Plaintiff would file a lawsuit against the DOC for failing to protect him in connection with the events that had taken place in Pen B-4 because the DOC has documented that, in the hundreds of other instances where inmates have been injured while in DOC custody, lawsuits by the injured inmates against the agency have invariably ensued.  (*See* Rosenfeld Reply Decl. Ex. H (DOC's Litigation Tracking Compilation"); *see also* Compl. ¶¶ 30-34 (discussing similar cases filed against DOC).)

Indeed, at the time that Defendant Brantley reviewed the surveillance footage, she "knew that inmates get beaten up by other inmates and claim that it was the [DOC]'s fault."  (Rosenfeld Decl. Ex. D at 39-40.)  Defendant Brantley also knew, at the time that she reviewed the footage, that Plaintiff had been beaten up and injured by a fellow inmate, removed from the Bronx Criminal Courthouse, taken to the emergency room at Lincoln Hospital, and diagnosed with a broken jaw.  (*See* *id.* at 39-41; Hr'g Tr. at 16.)  In addition, she would have known that, after three days, Plaintiff was moved from Lincoln Hospital to the North Infirmary Command on Rikers Island, (*id.* ¶ 75; *see also* Answer ¶ 75), where he remained for at least another month, (Compl. ¶ 79), and where he was interviewed by a DOC investigator, (*id.* ¶¶ 76-77; Answer ¶¶ 76-77).

In analogous situations where a party has knowledge that certain types of incidents tend to trigger litigation, courts within the Second Circuit have found that a duty to preserve relevant

video footage may attach as soon as the triggering incident occurs and prior to when a claim is filed.  For example, the court in <u>Slovin v. Target Corporation</u>, No. 12 Civ. 863 (HB), 2013 WL 840865, (S.D.N.Y. Mar. 7, 2013), ruled that the obligation to preserve video footage of a customer's fall in a Target store attached "at the time of the accident" because "Target was undoubtedly aware immediately following the fall that the video would likely be relevant to future litigation."  <u>Id.</u> at *3.  As is particularly relevant to the present case, the <u>Slovin</u> Court reached its decision after considering that Target only saved video recordings for thirty days from the date of creation and the plaintiff had filed her lawsuit approximately four months after the incident in question.[10]  <u>Id.</u>

Similarly, the court in <u>Matteo v. Kohl's Depatrment Stores, Inc.</u>, No. 09 Civ. 7830 (RJS), 2012 WL 760317, (S.D.N.Y.  Mar. 6, 2012), found that—even though an injured plaintiff had waited ten months before filing a claim and despite the fact that the defendants only retained video surveillance footage for sixty days—"there [was] little doubt that, at the time of the accident, [d]efendants could have expected [p]laintiff to file a lawsuit."  <u>Id.</u> at *3, <u>aff'd</u>, 2013 WL 3481365, at *2 (2d Cir. July 12, 2013); <u>see also</u> <u>Simoes v. Target Corp.</u>, No. 11 Civ. 2032 (DRH), 2013 WL 2948083, at *3 (E.D.N.Y. June 14, 2013) (holding that the duty to preserve video surveillance footage attached "[o]n the same day as the incident [because] Target had knowledge of the [plaintiff's] slip and fall, . . . and [also knew] that there was liquid on the floor where plaintiff fell"); <u>Siggelko v. Kohl's Dep't Stores, Inc.</u>, No. 06 Civ. 2281 (JS), 2009 WL 750173, at *3 (E.D.N.Y. Mar. 17, 2009) ("Assuming that Plaintiff suffered some injury, Kohl's

---

[10]At oral argument and in their papers, Defendants asserted that <u>Slovin</u> was distinguishable because "counsel in that case [had] contacted [the] defendants . . . one week after the incident and requested video immediately."  (Hr'g Tr. at 18; <u>see also</u> Defs.' Mem. at 9-10.)  This fact is, however, of little use to Defendants because the <u>Slovin</u> Court expressly stated that counsel's communications with Target were "simply icing on the cake, since the obligation [to preserve the video footage] arose at the time of the accident."  2013 WL 840865, at *3.

could have anticipated that Plaintiff would file a lawsuit shortly thereafter.").

Accordingly, given the facts of this case and the DOC's experience with prior litigation arising from inmate on inmate assaults, it was reasonable for Defendants to have anticipated within a week of the May 24, 2011 assault that Plaintiff would initiate litigation against the DOC for failing to protect him.  Defendants' duty to preserve evidence relevant to such a lawsuit by Plaintiff therefore arose prior to when the surveillance footage was deleted.

### b.   Scope of Defendants' Preservation Duty

Once the duty to preserve evidence attaches, a party must save any evidence that it "reasonably should know is relevant" to an anticipated action.  Zubulake, 220 F.R.D. at 217; see also Usavage v. Port Auth. of N.Y. & N.J., No. 10 Civ. 8219 (JPO), 2013 WL 1197774, at *10 (S.D.N.Y. Mar. 26, 2013) (acknowledging that, while the duty to preserve video surveillance does not include "all footage," it does encompass the preservation of all "potentially relevant footage") (emphasis in original).

In anticipating that Plaintiff would bring a lawsuit against the DOC for failing in its duty to protect him, Defendants should have reasonably known that any evidence depicting Plaintiff's treatment in the Pen B-4 holding cell would be relevant to his lawsuit.  Such evidence should have included the entire three hours of surveillance footage not only because the footage related to how Plaintiff's jaw became severely injured while in the holding cell, but also because it contained evidence of: (1) the manner in which DOC officers had carried out their duty to protect the cell inmates before and after Plaintiff was injured and (2) the identity of potential witnesses to the assault.  Indeed it was reasonable for Defendants to have known that the full length of recorded surveillance footage was relevant to Plaintiff's lawsuit because they were interested in the footage for somewhat the same reasons.  As Defendant Brantley herself acknowledged,

14

viewing the complete recording a couple of times was necessary to determine if DOC officers had followed DOC policies and adequately supervised the holding cell, and also to see if Plaintiff had made any contact with any officers during those three hours, or asked for assistance, or made any indication that he was in distress.  (See Rosenfeld Decl. Ex. D at 6-9.)

Defendants argue that, even if they did have a duty to preserve the video surveillance footage, they met this duty by preserving what they describe as the only two four-minute segments of "relevant" footage.  (See Defs.' Mem. at 5.)  Defendants' argument, however, misconstrues the scope of "all relevant evidence" under the reasonable anticipation of litigation standard.  Under the DOC's video preservation policy, DOC officers are required to make "available video recorded evidence of incidents" in order "to enhance the investigation process of Use of Force and Unusual Incidents."  (Rosenfeld Decl. Ex. E.)  Defendant Brantley testified that, pursuant to this policy, she saved only the footage that depicted "the actual unusual incident" when Boyce punched Plaintiff, and "the actual use of force" when the DOC officers used mace to separate Plaintiff and Boyce.  (Rosenfeld Reply Decl. Ex. J at 7; see also Rosenfeld Decl. Ex. D. at 41-42.)  About the surveillance footage between these two events, she stated, "it wasn't needed for the investigation."  (Rosenfeld Decl. Ex. D at 25.)  The fact, however, that only two four-minute portions of surveillance footage were deemed relevant to the DOC's investigation of the use of force and inmate on inmate assault is separate and apart, and also less broad, as the inquiry about what was "potentially relevant" to a lawsuit against the DOC for failure to protect.  See Usavage, 2013 WL 1197774, at *10.

Thus, because as discussed above, Defendants should have reasonably known that the entire three hours of surveillance footage would be relevant to a lawsuit against the DOC for failure to protect and because this footage has been destroyed, Defendants have breached their

preservation duty.[11]  See Slovin, 2013 WL 840865, at *3 (concluding that the defendant's

obligation to preserve surveillance footage required that it save an "unedited version of the

footage . . . that [wa]s continuous and certainly longer than two minutes" because the preserved

footage could have shown relevant events leading up to and following the incident); Essenter v.

Cumberland Farms, Inc., No. 09 Civ. 0539 (LEK), 2011 WL 124505, at *7 (N.D.NY. Jan. 14,

2011) ("[T]here is no doubt that a video depicting the time before, during, and after an incident is

relevant to determine what actually happened at the moment the injury occurred."); see also

Simoes, 2013 WL 2948083, at *4.

### 2. Culpable State of Mind

"Even where the preservation obligation has been breached, sanctions will only be

warranted if the party responsible for the los[t evidence] had a sufficiently culpable state of

mind."  In re WRT Energy Sec. Litig., 246 F.R.D. 185, 195 (S.D.N.Y. 2007).  A party is found to

have acted with a sufficiently culpable state of mind when "evidence was destroyed knowingly,

even without intent to breach a duty to preserve it, or negligently."  Residential Funding, 306

F.3d at 108 (internal quotation marks omitted) (emphasis in original); see also Reilly v. Natwest

Mkts. Grp. Inc., 181 F.3d 253, 267 (2d Cir. 1999) (acknowledging that the failure to preserve

---

[11]In support of their argument to the contrary, Defendants rely on Usavage v. Port Authority of New York & New Jersey, No. 10 Civ. 8219 (JPO), 2013 WL 1197774 (S.D.N.Y. Mar. 26, 2013).  (See Defs.' Mem. at 5.)  Specifically, in Usavage, the dispute focused on surveillance footage that had been recorded by multiple cameras at different locations in a train station.  See 2013 WL 1197774, at *10.  The defendant had saved surveillance footage recorded by cameras at the locations which plaintiff identified in his own statements, but the defendant had not saved any footage recorded at the locations which plaintiff failed to identify.  Id.  Because some of the footage that was deleted "might have captured" the contested incident, the plaintiff argued spoliation sanctions were in order.  Id.  The Usavage Court rejected this "speculative" argument because it concluded that the plaintiff had failed to put the defendant "on notice of the potential salience of th[e] deleted footage."  Id.  In so doing, the Court reasoned that "[t]he fact that, with perspective adjusted by hindsight and over a year of discovery, it might [have] be[en] helpful for [the defendant] to have preserved the disputed footage does not control."  Id.  Notably, the dispute here involves only one camera and Defendants cannot claim that they had no notice of the "potential salience" of the footage that this camera recorded.

evidence can fall "along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality") (internal quotation marks omitted).

### a. Negligence

As multiple other courts have recognized, "once the duty to preserve attaches, any destruction [of relevant evidence] is, at a minimum, negligent." Slovin, 2013 WL 840865, at *4 (internal quotation marks omitted); see also Zubulake, 220 F.R.D. at 218, 220 (recognizing that, once a party reasonably anticipates litigation, failure to suspend routine document destruction constitutes negligence).  Here, as just discussed, the duty to preserve the full three hours of surveillance footage attached before the footage was destroyed because Defendants should have known within a week of the May 24, 2011 assault that the footage would be relevant to a lawsuit for failure to protect.  Thus, at a minimum, Defendants were negligent in allowing the footage to be deleted.  See Slovin, 2013 WL 840865, at *4.

### b. Gross Negligence

Defendants were not, however, "grossly negligent" in failing to preserve the full three hours of surveillance footage.  In its recent opinion, Chin v. Port Authority of N.Y. & N.J., 685 F.3d 135 (2d Cir. 2012), the Second Circuit rejected the proposition that the "failure to institute a 'litigation hold' constitutes gross negligence per se," id. at 162, and this case is not akin to the circumstances in which other courts post Chin have found gross negligence to exist, cf. Sekisui American Corporation v. Hart, No. 12 Civ. 3479 (SAS), 2013 WL 4116322, at *6 (S.D.N.Y. Aug. 15, 2013) (finding gross negligence where plaintiff delayed instituting litigation hold until fifteen months after notice of claim and failed to notify party responsible for preserving its documents for an additional six months).

In this case, no relevant evidence is purported to have been destroyed after Plaintiff filed his Notice of Claim.  Rather, the three hours of contested surveillance footage were destroyed prior to when Plaintiff filed his Notice of Claim and pursuant to the DOC's automatic video recycling procedures.  Plaintiff has introduced no evidence to suggest that any DOC officer willfully deleted the surveillance footage; and Defendants did, at least, preserve eight minutes of footage.  In addition, Defendants both conducted an internal investigation into the assault on Plaintiff and assisted with the Bronx DA's prosecution of Boyce.  Taken together, these factors suggest that—while the DOC might have troublingly ad hoc video retention and preservation policies—the destruction of the surveillance footage in this case was only negligent.  See Chin, 685 F.3d at 162 (directing that the failure to adopt good preservation practices is but "one factor in the determination of whether discovery sanctions should issue"); see also Zubulake, 220 F.R.D. at 221 (finding that even though a defendant was "negligent, and possibly reckless," in preserving relevant documents, defendant had not been intentionally or grossly negligent).

    3.  Assistive Relevance

Finally, a party seeking sanctions for spoliation must "adduce sufficient evidence from which a reasonable trier of fact could infer [that] the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction."  Residential Funding, 306 F.3d at 108-09 (quotation marks and citations omitted).  In other words, the moving party must demonstrate not only that the spoliator destroyed "relevant" evidence as that term is ordinarily understood, but also that the evidence it destroyed would have been of some "assistive relevance" and favorable to the moving party's claims or defenses.  See id. at 108-10 (explaining that "relevant" in context of spoliation sanctions "means something more than sufficiently

probative to satisfy Rule 401 of the Federal Rules of Evidence"); see also Orbit One Commc'ns, Inc. v. Numerex Corp., 271 F.R.D. 429, 438-39 (S.D.N.Y. 2010); Zubulake, 220 F.R.D. at 221.

Where, as here, evidence has been destroyed due to negligence, the party moving for sanctions bears the burden of establishing that the destroyed evidence would have been favorable to his claims.  See Residential Funding, 306 F.3d at 109; see also Orbit One Commc'ns, 271 F.R.D. at 439 ("In the absence of bad faith or other sufficiently egregious conduct, it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him.") (internal quotation marks omitted).  A moving party can carry its burden and make "[s]uch a showing . . . by pointing to extrinsic evidence tending to demonstrate that the missing evidence would have been favorable to the movant."  Treppel v. Biovail Corp., 249 F.R.D. 111, 122 (S.D.N.Y. 2008).  This burden notwithstanding, "a court must not hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence because doing so would . . . allow parties who have destroyed evidence to profit from that destruction."  In re Pfizer, Inc. Sec. Litig., 288 F.R.D. 297, 315 (S.D.N.Y. 2013) (internal quotation marks omitted); see also Residential Funding, 306 F.3d at 109; Kronisch v. United States, 150 F.3d 112, 128 (2d Cir. 1998).

Here, Plaintiff has met his burden to show that the deleted surveillance footage would have been of the nature he alleges based on the following circumstantial evidence: (1) Plaintiff went into the Pen B-4 holding cell without a broken jaw and he emerged at around 3:15 p.m. with one, (see generally Compl.); (2) the Assault Footage shows that Boyce punched Plaintiff at around 12:22 p.m. and that there were approximately fifteen to twenty other inmates in the holding cell at the time, (see Rosenfeld Decl. Ex. C); (3) the Use of Force Footage shows that at around 3:00 p.m. only two inmates besides Plaintiff and Boyce remained in the cell, (see

Rosenfeld Decl. Ex. B); and (4) Defendant Brantley testified that, over the course of three hours, DOC officers removed inmates from Pen B-4 for court appearances, and that whenever the officers did remove an inmate, they came to the holding cell door, near to which Plaintiff was standing, (see Rosenfeld Decl. Ex. D at 8, 12, 17-19, 50-51).

Taken together, these facts suggest that Plaintiff was left injured in the Pen B-4 holding cell for three hours while DOC officers repeatedly came to the holding cell door to remove other inmates. A reasonable trier of fact could therefore infer that, had the surveillance footage not been deleted, it would have corroborated his allegation that DOC officer John Doe #1 came into the holding cell and "looked right at" Plaintiff, who was "covered in blood and . . . spitting blood from his mouth and did nothing."[12] (Compl. ¶ 59.) A reasonable trier of fact could also infer that the destroyed surveillance footage would have supported his allegations that "no DOC staff took any steps to protect him" during and after the assault by Boyce. (Id. ¶¶ 54-55.) A reasonable trier of fact could thus further infer that the destroyed surveillance footage would have supported Plaintiff's claim that the DOC officers in charge of supervising the Pen B-4 holding cell breached their duty to protect him, or were behaving in an otherwise negligent or complicit manner on May 24, 2011. (See id. ¶¶ 130-3, 134-35); see also Slovin, 2013 WL 840865, at *5 (finding deleted video surveillance footage to have been of assistive relevance in tort action against Target because the footage "would have shown whether the Target employees were following or blatantly disregarding the internal policies described . . . [at] deposition").

Requiring Plaintiff to provide more direct proof as to the content of the surveillance footage would be to hold him to "too strict a standard of proof" in contravention of controlling

---

[12]The preserved Use of Force Footage shows that Plaintiff was wearing a black shirt, which would not show blood, and khaki-colored pants, which could be construed as showing a pink area on the left knee of the pantleg as Plaintiff is being removed from the holding cell. (See Rosenfeld Decl. Ex. C.)

precedent.  See Residential Funding, 306 F.3d at 109; Kronisch, 150 F.3d at 130.  Accordingly, because Plaintiff has shown that the deleted three hours of surveillance footage would have been favorable to his claims and because Defendant Brantley was the only person to have reviewed this footage before it was deleted, this Court finds that Plaintiff has been prejudiced by the destruction of the surveillance footage and spoliation sanctions are in order.

### B.    Appropriate Sanctions

Having found Defendants liable for the spoliation of evidence, the issue of sanctions must be considered.  A district court has broad discretion when determining the appropriate sanctions for spoliation so long as the sanctions imposed are "molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine."  West, 167 F.3d at 779.  The Second Circuit has elaborated that sanctions serve the purpose of: "(1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation." Chin, 685 F.3d at 162 (quoting Byrnie v. Town of Cromwell, 243 F.3d 93, 107 (2d Cir. 2001)).

Here, Plaintiff requests that the Court: (1) preclude Defendant Brantley from testifying as to what she observed when she reviewed the now-deleted three hours of surveillance footage; (2) provide an adverse inference instruction which would permit, but would not require, the jury to presume that the deleted surveillance footage would have corroborated Plaintiff's version of the events as alleged in paragraphs 54-57 and 59 of the Complaint;[13] and (3) award reasonable

---

[13]These allegations in the Complaint read as follows:

    54. On information and belief, Mr. Taylor remained unconscious, lying on the floor for several minutes.  While he lay on the floor of the holding cell, in full view of Defendants John Doe #1-4, who were less than ten feet away in the hallway outside the cell, Mr. Boyce and approximately six other inmates believed to also be members of the Bloods

attorney's fees and costs in connection with this motion.  (See Pl.'s Mem. at 16; Pl.'s Reply Mem. at 9-10; Hr'g Tr. at 10-11, 31.)

       1.  <u>Preclusion Order</u>

Plaintiff seeks to preclude Defendant Brantley from testifying about what she saw when she reviewed the now-deleted three hours of surveillance footage.  (Pl.'s Mem. at 17-19; Pl.'s Reply Mem. at 9-10; Hr'g Tr. at 10-11, 31.)  Plaintiff argues that if Defendant Brantley is allowed to testify from memory about this footage, it would not only be unfairly prejudicial to him, but it also would improperly help Defendants establish that they are not liable for what happened to Plaintiff while he was in the Pen B-4 holding cell.  (See id.)

Although preclusion is sometimes described as an "extreme" sanction, <u>Outley v. New York</u>, 837 F.2d 587, 591 (2d Cir. 1988), courts often rely on the remedy "to mitigate the specific prejudice that a party would otherwise suffer" as a victim of spoliation, <u>In re WRT Energy Sec. Litig.</u>, 246 F.R.D. at 200; <u>see also</u> <u>West v. Goodyear Tire & Rubber Co.</u>, 167 F.3d at 180 (advising a district court to consider the sanction in tandem with other sanctions as a way to "fully protect" an injured party from prejudice).

---

approached Mr. Taylor.  Then, Mr. Boyce and the other inmates repeatedly kicked and hit Mr. Taylor in an assault that lasted several more minutes.

55.  When Mr. Taylor regained consciousness, he was laying on the floor of the holding cell, surrounded by inmates. Mr. Taylor saw no correction officers in the cell, and no DOC staff took any steps to protect him or to stop the assault.

56.  Mr. Taylor stood up and began to spit blood out of his mouth. Blood was also gushing out of his nose.  He had a searing pain in his jaw and could feel that his jaw was seriously injured.  He was dizzy and wobbly on his feet.

57.  The other Bloods in the cell were loudly congratulating Mr. Boyce for knocking Mr. Taylor out.

59.  Defendant John Doe #1, who is a heavy-set, short African American correction officer, then entered the cell and removed several of the inmates, on information and belief, to bring them up for their court appearances.  Defendant John Doe #1 looked right at Mr. Taylor, who was covered in blood and still spitting blood out of his mouth—and did nothing.

Preclusion is warranted in this case because permitting Defendant Brantley to testify about what she observed on the now-deleted surveillance footage would only serve to exacerbate the harm that Plaintiff has suffered through the loss of the surveillance footage.  See Chin, 685 F.3d at 162.  Defendant Brantley was the only person to review the entire length of the footage and that footage is now destroyed and unavailable.  Plaintiff's ability to cross-examine Defendant Brantley about the deleted footage is therefore severely compromised.  This fact, combined with the fact that Defendant Brantley is herself a defendant in this action and her testimony would bear directly on her liability, further increases the risk that her testimony might be unduly colored in some way.[14]

Preclusion is also appropriate because permitting Defendant Brantley to testify about the now-deleted surveillance footage places the risk of "an erroneous evaluation" on Plaintiff, who is the injured party, and not—as it should be—on Defendants.  See Chin, 685 F.3d at 162.  During her deposition on April 23, 2013, Defendant Brantley acknowledged that she had last reviewed the surveillance footage several years ago and the lapse in time since then had made some of the footage details "hard to remember."  (Rosenfeld Decl. Ex. D at 16, 32-33.)  Defendant Brantley admitted, for example, that she could no longer remember whether Plaintiff spoke to any DOC officers during the three hours that he was in the Pen B-4 holding cell.  (Id. at 9-13, 15-16.)  Were Defendant Brantley to testify at trial, she would be even father removed in time from her last review of the surveillance footage and the risk of an erroneous evaluation of what she observed on the now-deleted surveillance footage would be only greater.

---

[14]In addition to this credibility concern, the Court is also troubled by the fact that, at her deposition, Defendant Brantley testified she had never been sued before, when in fact, she has been named as a defendant in three prior actions in the Southern District of New York, (see Rosenfeld Reply Decl. Ex. I), and has given deposition testimony as a defendant in two of these suits, see Holden v. City of New York, et al., No 08-cv-9601, ECF No. 35-3, and Parrilla v. City of New York, et al., No. 09-cv-8314, ECF No. 33-10.

For these reasons, and to mitigate the specific prejudice that Plaintiff might otherwise suffer on account of Defendants' spoliation, Defendant Brantley is precluded from testifying about what she observed during the portions of the surveillance footage that have since been deleted.

          2.  <u>Adverse Inference</u>

An adverse inference is appropriate in cases which involve the negligent destruction of evidence "not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss." <u>Residential Funding</u>, 306 F.3d at 108 (citing <u>Turner v. Hudson Transit Lines, Inc.</u>, 142 F.R.D. 68, 75 (S.D.N.Y. 1991)).

Here, Plaintiff requests that the Court provide an adverse inference instruction, which would permit, but would not require, the jury to presume that the deleted surveillance footage would have corroborated Plaintiff's version of the events as alleged in paragraphs 54-57 and 59 of the Complaint. Plaintiff contends that this adverse inference instruction "is most appropriately against the individuals who were employed at the Bronx pens [on May 24, 2011] so Defendant Brantley and John Does 1-4." (Hr'g Tr. at 36.)

Given the "evidentiary, prophylactic, punitive, and remedial rationales" underlying the remedy, <u>Kronisch</u>, 150 F.3d at 126, and in light of the foregoing analysis finding Defendants liable for the spoliation of the surveillance footage, the Court finds that a permissive adverse inference instruction against the individual defendants in this case is also an appropriate sanction. Had Defendants complied with their obligation to preserve the surveillance footage it would be available in this litigation to provide evidence concerning whether DOC officers adequately supervised the holding cell, whether Plaintiff asked the DOC officers for assistance, and whether

the DOC officers ignored evidence that Plaintiff was seriously injured.  An adverse inference instruction will help to restore the evidentiary balance and to ensure that Plaintiff does not suffer any undue prejudice from Defendants' negligence.  Of course, "[w]hether a reasonable trier of fact actually will draw [the] inference [put forth by Plaintiff] is a matter left for trial."  Byrnie, 243 F.3d at 110.  To this end, the Court will fashion the language of the instruction at the charging conference.

### 3.   Attorney's Fees and Costs

The Court's imposition of spoliation sanctions warrants the award of reasonable attorney's fees and costs to Plaintiff for his efforts with respect to this motion.  Such a monetary award is appropriate because it serves the remedial purpose of making Plaintiff whole for the costs he has incurred as a result of Defendants' spoliation.  See Slovin, 2013 WL 840865, at *7 (awarding costs where party negligently failed to preserve relevant video surveillance footage); see also In re WRT Energy Sec. Litig., 246 F.R.D. at 201 (discussing remedial purpose of attorney fee award in spoliation context).  In order to determine the amount of the award, Plaintiff's counsel should submit a fee application to be assessed by the Court and also send a copy of the application to Defense counsel.

## IV.       CONCLUSION

After considering the parties' arguments and for the reasons that follow, this Court orders that: (1) Plaintiff's request to preclude Defendant Brantley from testifying as to what she observed when she reviewed the now-deleted surveillance footage is GRANTED;  (2) Plaintiff's request for an adverse inference instruction which would permit, but would not require, the jury to presume that the deleted surveillance footage would have corroborated Plaintiff's version of the events as alleged in paragraphs 54-57 and 59 of the Complaint is GRANTED; and (3)

Plaintiff's motion for reasonable attorney's fees and costs in connection with this motion is

GRANTED.

    SO ORDERED.


Dated: September 4, 2013
New York, New York


                                        __s/s _____
                                          Robert P. Patterson
                                          U.S.D.J.

**COPIES OF THIS OPINION SENT TO:**

Attorneys for Plaintiff

Katherine Rosenfeld
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Phone: (212) 763-5000
Fax: (212) 763-5001
krosenfeld@ecbalaw.com

Jonathan S. Chasan
The Legal Aid Society – Prisoners' Rights Project
199 Water Street, 6th Floor
New York, NY 10038
Phone: (212) 577-3530
Fax: (212) 509-8433
jchasan@legal-aid.org

Attorney for Defendants

Diep Nguyen
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007
Phone: (212) 356-2328
Fax: (212) 788-9776
dinguyen@law.nyc.gov